## IN  THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND NORTHERN DIVISION

| | | |
|---|---|---|
| **CHESAPEAKE BAY FOUNDATION, INC.**<br>6 Herndon Avenue<br>Annapolis, MD 21403<br>Anne Arundel County | ) ) ) ) ) ) | |
| and | ) ) | |
| **SHORERIVERS**<br>114 South Washington Street, Suite 301<br>Easton, MD 21601<br>Talbot County | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. _____ |
| v. | ) ) | |
| **ANDREW WHEELER,** Administrator,<br>Environmental Protection Agency, | ) ) ) | |
| and | ) ) | |
| **ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | ) ) ) ) ) ) | |
| and | ) ) | |
| **RICKEY DALE "R.D." JAMES**,<br>Assistant Secretary of the Army (Civil Works)<br>108 Army Pentagon<br>Washington, DC 20310 | ) ) ) ) ) ) | |
| and | ) ) | |
| **ARMY CORPS OF ENGINEERS**<br>441 G Street NW<br>Washington, DC 20314 | ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF**

1.     This action arises from the United States Environmental Protection Agency's and United States Army Corps of Engineers' (hereafter "Defendants" or "Agencies") most recent and egregious attempt to strip water quality protections for waters in the United States, which narrows the scope of the Clean Water Act in a manner that is irreconcilable with the intent and plain meaning of the statute. The Navigable Waters Protection Rule: Definition of "Waters of the United States", 85 Fed. Reg. 22,250 (Apr. 21, 2020) (hereinafter the "Final Rule").

2.     Plaintiffs have also challenged the Defendants' final rule—Definition of "Waters of the United States"—recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Final Repeal Rule")—in this court. The Agencies undertook a two-step process to repeal and replace the 2015 Clean Water Rule. First, the Agencies issued a regulation to repeal the 2015 Rule defining "waters of the United States" and reinstated the 1986 regulations while the Agencies developed a new definition of "waters of the United States." *Id*. Second, the Agencies issued a regulation to replace the 2015 Clean Water Rule with the Navigable Waters Protection Rule, which would severely reduce the scope of the waters protected by the Clean Water Act. Final Rule, 85 Fed. Reg. at 22,250.

3.     While these two actions represent step one and two of a bifurcated process to repeal and replace the 2015 Clean Water Rule, the regulatory records are distinct and the standards for repealing an existing regulation and promulgating a new regulation differ. For clarity, Plaintiffs have filed two separate complaints and intend to develop separate records for review but are amenable to coordinating future filing deadlines and motions practice between the two matters to conserve judicial resources.

4.     The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The statute aims to

accomplish this by prohibiting the discharge of pollutants, including dredge and fill material, into navigable waters without a permit to do so. 33 U.S.C. §§ 1311(a); 1342; 1344; 1362(12). The Act defines "navigable waters" as "the waters of the United States, including the territorial seas." *Id.* at § 1362(7). But the statute does not define "waters of the United States," which has led to decades long efforts from the executive and judicial branches to clarify the definition. The 2015 Clean Water Rule defined "waters of the United States" in line with Supreme Court precedent and was supported by ample science establishing the connectivity of waters. Clean Water Rule: Definition of "Waters of the United States", 80 Fed. Reg. 37,054 (June 29, 2015) ("Clean Water Rule").  In contrast, the Final Rule rejects the interpretation of "waters of the United States" as defined by the Supreme Court and longstanding agency practice and is counter to the purpose of the Clean Water Act.

5.     The Final Rule significantly reduces the scope of the Clean Water Act by limiting the waters deemed jurisdictional far beyond any prior interpretation of the phrase. The Final Rule strips coverage from key waterbodies and wetlands that watershed science has demonstrated to have a significant nexus to downstream waters—and that when degraded, impacts the overall health of the waterbodies they connect to. The Final Rule removes all ephemeral streams from protection and requires wetlands to maintain a surface water connection to a traditionally navigable water, an interpretation previously rejected by the majority of the Supreme Court.

6.     The Final Rule will profoundly impact the Chesapeake Bay; the nation's largest estuary and a national treasure. Chesapeake Bay Watershed Agreement 1 (2014), https://www.chesapeakebay.net/documents/FINAL_Ches_Bay_Watershed_Agreement.withsigna tures-HIres.pdf ("Chesapeake Bay Watershed Agreement"). The Bay receives half of its water from an intricate network of hundreds of thousands of creeks, headwater streams, and rivers, and

1.5 million acres of wetlands, many of which are non-navigable tributaries, non-tidal wetlands, and ephemeral and intermittent streams. Chesapeake Bay Program, *Facts and Figures*, https://www.chesapeakebay.net/discover/facts (last visited Apr. 20, 2020); Chesapeake Bay Program, *Watershed's Non-tidal Wetlands Provide a Multitude of Benefits to the Bay*, https://www.chesapeakebay.net/news/article/watersheds_non_tidal_wetlands_provide_a_multitude_of_benefits_to_the_bay (last visited Apr. 24, 2020). Restoration of the Chesapeake Bay—as well as waters across the country—depend on a definition of "waters of the United States" that affords protection in broad terms consistent with the purpose of the Act.  Removal of headwater streams and upland wetlands from Clean Water Act jurisdiction harms that restoration and prevents that protection.

7.     The Chesapeake Bay has long been polluted by excess nutrients entering the Bay's tributary rivers, streams, and wetlands. Excess nitrogen, phosphorus, and sediment lead to an overabundance of algae, known as algal blooms. Algal blooms in combination with sediment block sunlight from reaching underwater grasses that serve as food and habitat for many Bay species. Once algal blooms begin to decay, the decomposition process robs the Bay of oxygen, leading to hypoxic (low oxygen) and anoxic (no oxygen) conditions in the Bay. In these low oxygen conditions, many species of commercially valuable fish and crustaceans cannot survive.

8.     To restore the Chesapeake Bay, the EPA issued the Chesapeake Bay Total Maximum Daily Load ("Bay TMDL") on December 29, 2010. The Bay TMDL was created under the Clean Water Act by the EPA and Bay jurisdictions of Maryland, Virginia, Pennsylvania, Delaware, New York, West Virginia, and the District of Columbia to reduce the amount of pollutants entering the Bay and its tributaries. Clean Water Act Section 303(d): Notice for the Establishment of the Total Maximum Daily Load for the Chesapeake Bay, 76 Fed. Reg. 549 (Jan.

5, 2011). The Bay TMDL set watershed wide limits on the amount of nitrogen, phosphorus, and sediment that could enter the Bay and its tributaries while still meeting the water quality standards set for the Chesapeake Bay. See EPA, Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus, and Sediment (Dec. 29, 2010), https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-document ("Bay TMDL"); Bay TMDL Executive Summary, ES-1, https://www.epa.gov/sites/production/files/2014-12/documents/bay_tmdl_executive_summary_final_12.29.10_final_1.pdf. It is CBF's mission to save the Chesapeake Bay, by defending Bay TMDL and ensuring compliance with its terms through each state's Watershed Implementation Plan (together the Blueprint).

9.     To create the Chesapeake Bay TMDL, the entire Chesapeake Bay watershed was divided into 92 individual segments with assigned waste load allocations and load allocations. Bay TMDL, ES-3; Chapter 9: Chesapeake Bay TMDLs, https://www.epa.gov/sites/production/files/2014-12/documents/bay_tmdl_executive_summary_final_12.29.10_final_1.pdf (providing the nutrient limits for each of the 92 segment TMDLS); Bay TMDL, Appendices Q and R, https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-appendices (More detailed LAs and WLAs are provided in Appendix Q for annual TMDLs and in Appendix R for daily TMDLs). Waste load allocations are numeric pollutant limits assigned to a specific body of water for pollution coming from point sources, i.e. discrete conveyances of pollutants from permitted entities like waste water treatment plants, municipal separate storm sewer system ("MS4") permits, National Pollution Discharge Elimination System ("NPDES") permits, and dredge and fill permits. 40 C.F.R. § 130.2(h). Load allocations are numeric pollutant limits assigned to nonpoint sources of pollutants, including agricultural and stormwater runoff. 40 C.F.R. § 130.2(g). Meeting the

waste load allocations and load allocations for each of the 92 segments is essential to the recovery of the Chesapeake Bay and achieving the commitments of the Bay TMDL. Removing headwater streams and adjacent wetlands from coverage under the Clean Water Act also removes those waters from coverage under the TMDL, which lessens the ability of the Bay jurisdictions to meet the requirements of the Bay TMDL.

10.    The permitting provisions of the Clean Water Act are key to achieving the goals of the Bay TMDL, and the Final Rule reduces the number of water bodies protected by the permitting sections of the Act. For example, the 2015 Clean Water Rule expressly protected tributaries to rivers as jurisdictional waters, and extended protections to Delmarva Bays (seasonal freshwater wetlands) and pocosins (a wetland bog with sandy, peat soil) that have a significant nexus to navigable waters. Clean Water Rule, 80 Fed. Reg. at 37,071. Thousands of Delmarva Bays and pocosins dot the Delaware, Maryland, and Virginia peninsula. The Final Rule removes protections for these waters, as well as ephemeral streams and non-adjacent wetlands. If the Final Rule is not vacated, a pollution discharger would no longer need a permit to release pollutants into or dredge and fill these waters. As a result, the area of the watershed covered by discharge permits will be greatly reduced, leading to more harmful pollution entering the Bay and its tributaries, which impacts the success of the Blueprint.

11.    The 2014 Chesapeake Bay Watershed Agreement, a multi-jurisdictional agreement signed by the watershed jurisdictions and federal agencies, recommitted the Bay jurisdictions and EPA to meeting the goals of the Bay TMDL. *See* Chesapeake Bay Watershed Agreement, at 16. The Chesapeake Bay Watershed Agreement identifies wetlands as habitat to be protected: the Vital Habitats goal directs the creation or reestablishment of 85,000 acres of tidal and non-tidal wetlands and enhancing the function of an additional 150,000 acres of degraded wetlands by 2025. *Id*. at 5.

The Healthy Watersheds goal also recognized that many small watershed—likely comprised of headwater streams and healthy wetlands—are currently healthy but "at risk of degradation as the demand for local lands and resources increases." *Id*. at 9. The Chesapeake Bay Watershed Agreement directed that "100 percent of state-identified currently healthy waters and watersheds remain healthy." *Id*. Because the Final Rule eliminates federal and, in some cases, state statutory protections for such waters, it will harm the ability of the Bay jurisdictions, including EPA, from meeting the commitments of the Chesapeake Bay Watershed Agreement.

12.     The Agencies arbitrarily issued the Final Rule, contrary to the plain language of the Clean Water Act, the legislative history, and the controlling case law.

13.     The Agencies arbitrarily issued the Final Rule by rejecting the consensus of the scientific community with no evidence to support their contrary position.

14.     The Agencies arbitrarily issued the Final Rule by failing to analyze the environmental impacts of removing waters and wetlands from protection under the Clean Water Act.

15.     Therefore, Chesapeake Bay Foundation, Inc. and ShoreRivers jointly request this court to issue an injunction to prevent the Final Rule from taking effect and vacate the Final Rule, as its issuance was arbitrary, capricious, an abuse of discretion and not in accordance with the law. 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

16.     This action is brought pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§701-706, which waive the defendant's sovereign immunity. This Court has jurisdiction over the plaintiff's claims under 28 U.S.C. § 1331 (federal

question) and may issue a declaratory judgement and further relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§2201 and 2202.

17.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) and local rules because plaintiffs Chesapeake Bay Foundation and ShoreRivers reside within this District.

## PLAINTIFFS

18.     The plaintiff organizations in this case, as well as their members, are committed to protecting "the chemical, physical, and biological integrity of the Nation's waters[,]" specifically the Chesapeake Bay and the tributaries and wetlands in the watershed. 33 U.S.C. § 1251(a).

19.     Plaintiff Chesapeake Bay Foundation, Inc. (CBF) is a 501(c)(3) non-profit organization committed to saving the Bay and keeping it saved, through the implementation of the Chesapeake Bay TMDL. CBF represents more than 300,000 members and e-subscribers across the country, and has offices in Annapolis and Easton, Maryland; Richmond and Virginia Beach, Virginia; Harrisburg, Pennsylvania; and the District of Columbia. For over 50 years, CBF has been working to restore the Chesapeake Bay and its tributary rivers and streams. CBF scientists and legal staff monitor the administration of the Clean Water Act as it relates to the health of the Chesapeake Bay.

20.     CBF and local stakeholders sued EPA to require it to develop the Chesapeake Bay TMDL. *Fowler v. EPA*, No. 1:09-C-00005-CKK, 2009 U.S. Dist. LEXIS 132084 (D.D.C. 2009). This matter resulted in a settlement agreement with the United States requiring EPA to, among other things, issue the Chesapeake Bay Total Maximum Daily Load by December 31, 2010.

21.      CBF participated extensively in the development of the Chesapeake Bay TMDL and the development of the Bay jurisdictions' three Watershed Implementation Plans. The TMDL required the Bay jurisdictions to develop watershed implementation plans that explained how the

jurisdictions would meet the waste load and load allocations established in the TMDL. *See supra* ¶¶ 8–9. CBF continues to participate in efforts to implement and refine the Blueprint throughout the Bay watershed. The Blueprint presents the best example of cooperative federalism working towards the goal of restoring the Bay. However, the Blueprint goals will only be met if the Clean Water Act is properly interpreted and enforced, not weakened. The Final Rule harms the interests of CBF and its members by reducing the scope of federal jurisdiction of the Clean Water Act.

22.     CBF as an organization is harmed by the Final Rule. CBF has spent millions of dollars restoring waterways; advocating at the local, state, and federal level for clean water protections; educating students and teachers about the value of the Chesapeake Bay and its tributaries; and filing legal actions in state and federal courts in support of water quality protections and the preservation of wetlands. The Final Rule removes from protection certain waters found within the Bay watershed, e.g., ephemeral headwater streams, Delmarva Bays and pocosins, and non-adjacent wetlands.   The Final Rule subjects these waters to possible destruction or degradation, which will also harm water quality in the Chesapeake Bay.

23.     CBF operates its Education Department throughout the watershed, taking students and teachers on trips to immerse classes in Bay ecology, and learn about the threats facing its recovery. CBF spends over $4 million a year on education programming throughout the Bay watershed. CBF educators lead students and teachers on trips in wetlands areas, headwater streams, and other seasonal waters and wetlands to investigate macroinvertebrates and conduct water quality sampling. Polluted waters significantly affect the efficacy of these education trips. When waters are polluted educators and students limit contact with the water, thereby hampering the ability of students to investigate a given waterbody. Reducing the scope of the Clean Water Act's

jurisdiction harms CBF's education department. The potential for increased pollution resulting from this rule will hamper CBF's education programming and its use of local waterways.

24.     The activities of CBF's Environmental Protection and Restoration Department are also harmed by the Final Rule. CBF conducts extensive restoration projects throughout the Bay watershed, included tree plantings to create streamside buffers and wetlands restoration projects. These restoration programs cost over a million dollars each year. Many of these stream plantings occur in areas where streams run through farms. These restoration efforts will be negatively impacted if waterbodies loose protection under the Clean Water Act. Restoration projects will become less effective if the surrounding water bodies are polluted. Decisions over where to install best management practices (or "BMPs") and other restoration projects may change if water bodies are no longer protected by the Clean Water Act.

25.     CBF works across the watershed restoring wetlands and ephemeral or intermittent streams to reduce pollution entering the Bay's tributaries. For example, CBF restored wetlands on the Old Naval Academy dairy farm in Odenton, Maryland, which improved the ability of the wetlands to filter sediment and nutrient pollution and reduce erosive runoff velocities. CBF members and volunteers participated with CBF staff in planting vegetation associated with this project.

26.     In Virginia, CBF is working with a farm in Augusta County to remove livestock from a spring branch that originates on the property, as well as all the surface water flowing through the property. CBF is providing financial assistance for the project through the South River/ Christians Creek 319 TMDL program. This program will provide a well, watering system for the livestock, and will install fencing to remove livestock access from all surface water. In total, this project will restore 6.8 acres of riparian forested buffer.

27.     CBF has been working since 2018 on a farm in Winchester, Virginia to help implement a Conservation Plan. With financial help from CBF, the farm is now installing a system of fences and water supply features that will allow them to raise animals without allowing their livestock to access the farm's streams and wetlands. When completed, their new system of BMPs will help protect 13 acres of wetlands and headwater stream riparian buffers.

28.     The Final Rule harms CBF's restoration work by weakening protections for wetlands and ephemeral streams, thereby threatening the efficacy of restoration projects across the Bay watershed.

29.     CBF members will be harmed if the Final Rule is upheld. CBF's members from across the country live near and recreate in waters of the United States and their tributaries or nearby wetlands. CBF members enjoy swimming, kayaking, boating, sailing, fishing, crabbing, bird watching, and other aesthetic and recreational pursuits in the waters of the Chesapeake Bay, its rivers and streams, and wetlands. Some of these members own property with waters that will no longer be protected by the Clean Water Act.  These members are fearful that the decision to remove protections for local waterways, including tributary streams and wetlands located within the Bay watershed, will lead to increased pollution in these waterways. The Final Rule therefore harms their use and interest in the Bay's waters.

30.     The Bay is an economic engine in the region, supporting robust fishing and aquaculture industries, as well as recreation and tourism industries. A compromised Bay threatens the health of those industries, and the members who rely on those industries for their income.

31.     Plaintiff ShoreRivers is a 501(c)(3) non-profit organization whose mission is to protect and restore Eastern Shore waterways through science-based advocacy, restoration, and education. ShoreRivers is headquartered in Easton, Maryland. ShoreRivers represents more than

3,500 members and supporters across the Eastern Shore. ShoreRivers has a dedicated staff of educators, scientists, restoration specialists, and advocates that focus on policies and projects that improve the health of rivers on the Delmarva peninsula. ShoreRivers staff includes four Riverkeepers who regularly patrol and monitor waterways in the Eastern Shore: the Chester Riverkeeper, the Choptank Riverkeeper, the Miles/Wye Riverkeeper, and the Sassafras Riverkeeper.

32.     ShoreRivers conducts extensive restoration work across the Delmarva peninsula in order to reduce the pollution entering local waterbodies. As of 2019, ShoreRivers installed 131 pollution reduction projects across the Eastern Shore. These restoration projects are aimed at reducing the amount of sediment and nutrients entering waterways on the Delmarva peninsula, and are threatened by the weakening of the Clean Water Act's protections. The Final Rule will harm ShoreRivers and its efforts to restore local waterways on the Delmarva Peninsula.

33.     ShoreRivers' members are harmed by the Final Rule. These members enjoy swimming, kayaking, boating, sailing, fishing, crabbing, bird watching, and other aesthetic and recreational pursuits in rivers, streams and wetlands on the Delmarva Peninsula that will be impacted by the rule. Members also own property with streams and wetlands at risk of losing protection under the Clean Water Act and are concerned that pollution upstream may harm water quality on their property. Members also rely on clean water for their livelihood, through aquaculture operations on the Eastern Shore. These endeavors are threatened by the removal of streams and wetlands from Clean Water Act protections and the resulting negative effects on downstream water quality.

34.     ShoreRivers' members participate in water quality monitoring on all four of the major rivers on the Eastern Shore—the Chester, Choptank, Miles/Wye, and Sassafras river and

their creeks and tributary streams—as part of an extensive army of volunteer citizen scientists. ShoreRivers' members care about local water quality and are harmed by the decision to remove protections for local waterways, including tributary streams and wetlands.

## DEFENDANTS

35.    Defendant Andrew Wheeler, signer of the Final Rule, is sued in his official capacity as the Administrator of the United States Environmental Protection Agency.

36.    Defendant United States Environmental Protection Agency ("EPA") is the federal agency charged with implementing the majority of the Clean Water Act. The mission of the EPA is to protect human health and the environment. The EPA should work to ensure that "Americans have clean air, land and water; … efforts to reduce environmental risks are based on the best available scientific information; [and f]ederal laws protecting human health and the environment are administered and enforced fairly, effectively and as Congress intended[.]" EPA, *Our Mission and What We Do*, https://www.epa.gov/aboutepa/our-mission-and-what-we-do (last visited Apr. 20, 2020). The EPA is a signatory to the Chesapeake Bay Watershed Agreement, issued the Chesapeake Bay TMDL, and is responsible for its oversight and implementation.  33 U.S.C. § 1267(g).

37.    Defendant Rickey Dale "R.D." James, who signed the Final Rule for the United States Army Corps of Engineers, is sued in his official capacity as Assistant Secretary of the Army (Civil Works).

38.    Defendant United States Army Corps of Engineers ("Corps") is the federal agency responsible for the implementation of Section 404 of the Clean Water Act—the permit program for the discharge of dredged and fill material in the waters of the United States. 33 U.S.C. § 1344(a). The Corps is housed within the United States Army, as part of the United States

Department of Defense. The Corps is subject to the Chesapeake Bay TMDL pursuant to Executive

Order 13508 and is a signatory of the Chesapeake Bay Watershed Agreement.

## BACKGROUND

39.     For decades prior to the Clean Water Act, despite Congressional efforts, our waters

were a dumping ground for waste. In 1972, Congress passed the Clean Water Act, a comprehensive

water protection statute "to restore and maintain the chemical, physical, and biological integrity of

the Nation's waters." 33 U.S.C. § 1251(a).

40.     Key to the implementation of the Clean Water Act is the prohibition of discharging

pollutants into navigable waters or dredging and filling wetlands without a permit to do so. 33

U.S.C. §§ 1342, 1344.

41.     The Act defines "navigable waters" as the "waters of the United States, including

the territorial seas." 33 U.S.C. § 1362(7). But the Act does not define "waters of the United States."

The long-standing definition of "navigable waters" before the 1972 Clean Water Act included only

waters that are navigable in fact, meaning the waters are "used, or … susceptible of being used, in

their ordinary condition, as highways for commerce, over which trade and travel are or may be

conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 77 U.S. 557,

563 (1870).

42.     The legislative history of the Clean Water Act illustrates that Congress intended the

definition of navigable waters to be broader than the existing definition established by *The Daniel

Ball* based solely on navigability. See *United States v. Riverside Bayview Homes*, 474 U.S. 121,

132–33 (1985).  According to the Supreme Court,

> Protection of aquatic ecosystems, Congress recognized, demanded broad federal
> authority to control pollution, for '[water] moves in hydrologic cycles and it is
> essential that the discharge of pollutants be controlled at the source.' S. Rep. No.

92-414, p. 77 (1972). In keeping with these views, Congress chose to define the waters covered by the Act broadly. … the Act's definition of 'navigable waters' as 'the waters of the United States' makes it clear that the term 'navigable' as used in the Act is of limited import. … Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of the term. See S. Conf. Rep. No. 92-1236, p. 144 (1972); 118 Cong. Rec. 33756-33757 (1972) (statement of Rep. Dingell).

*Id.*

### *Rapanos* **and Regulatory Uncertainty**

43.     Despite the broad definition intended by Congress, the definition of "waters of the United States" repeatedly came before the courts as the Agencies attempted to implement the Clean Water Act permitting programs.

44.     The Supreme Court most recently considered the definition of the term "waters of the United States" in *Rapanos v. United States*, 547 U.S. 715 (2006). There, the Court was asked to determine whether non-navigable wetlands lying near drains or ditches that eventually emptied into traditional navigable waters constituted "waters of the United States." *Id.* at 729. The justices failed to come to an agreement, which resulted in the Court issuing a plurality opinion.

45.     In the plurality opinion, Justice Scalia proffered an interpretation of the Clean Water Act that would only protect "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Id.* at 739 (internal quotations and alterations omitted). Justice Scalia's interpretation of "waters of the United States" would not include "channels through which waters flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* Justice Scalia went on to state that "wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands" would be considered jurisdictional under the Act. *Id.* at 739, 742.

15

However, this narrow reading of the Act was rejected by five members of the Court, so it is not controlling.

46.     In a concurring opinion, Justice Kennedy concluded that wetlands are "waters of the United States" if the wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780. Justice Kennedy clarified that if the "wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the term 'navigable waters.'" *Id*. Justice Kennedy's decision came to be known as the "significant nexus" test.

47.     In the dissenting opinion, Justice Stevens would have conferred jurisdiction over the wetlands under the existing interpretation or using Justice Kennedy's significant nexus test but dissented on the grounds that the existing interpretation in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) controlled. *Id.* at 792, 808. Justice Kennedy's significant nexus test has therefore been viewed as the governing opinion to determine jurisdiction under the Clean Water Act.

48.     Importantly, Justice Roberts remarked in a concurring opinion that "no opinion command[ed] a majority of the Court on how precisely to read Congress' limits on the reach of the Clean Water Act." *Id*. at 758. This necessitated clarification from the Agencies, attempted first through guidance, and then, through the 2015 Clean Water Rule.

49.     In the wake of the *Rapanos* decision, the Agencies issued a guidance memorandum to instruct the regional offices of the agencies on the implementation of the *Rapanos* decision when asserting jurisdiction over waters of the United States. See EPA and Corps, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell*

*v.   United   States*,   https://www.epa.gov/sites/production/files/2016-04/documents/rapanosguidance6507.pdf (last visited Apr. 20, 2020). The memorandum stated that the agencies would assert jurisdiction over traditional navigable waters, wetlands adjacent to traditional navigable waters, relatively permanent non-navigable tributaries of traditional navigable waters, and wetlands that abut non-navigable tributaries. *Id*. at 1. The agencies would undertake a significant nexus analysis to determine jurisdiction of non-navigable tributaries that are not relatively permanent, wetlands adjacent to non-navigable tributaries that are not relatively permanent, and wetlands adjacent to but that do not directly abut a relatively permanent non-navigable tributary. *Id*.

50.   While the Agencies provided guidance on the implementation of the Clean Water Act post-*Rapanos*, the interpretation of "waters of the United States" was still uncertain. The guidance document was expressly not a regulation, furthering the need for the Agencies to promulgate binding regulations defining "waters of the United States."

**The Clean Water Rule**

51.   In response to the *Rapanos* decision and the resulting guidance, the Agencies developed the Clean Water Rule. Clean Water Rule, 80 Fed. Reg. at 37,054. The Clean Water Rule interpreted the Clean Water Act to "cover those waters that require protection in order to maintain the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, and the territorial seas." *Id.* at 37,055. The Clean Water Rule included protections for ephemeral streams, so long as they met the definition of "tributary" with defined beds and banks, and adjacent or neighboring wetlands within certain distances of navigable waters or their floodplain. *Id.* at 37,058.

17

52.     To develop the Clean Water Rule, the Agencies conducted an extensive review of over a thousand peer-reviewed scientific papers that addressed the connectivity of aquatic resources and effects on downstream waters, in order to understand whether a significant nexus exists. Proposed Rule, Definition of "Waters of the United States" Under the Clean Water Act, 79 Fed. Reg. 22,188, 22,222 (Apr. 21, 2014). The resulting report, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence*, underwent extensive peer review and public comment, including review by EPA's Scientific Advisory Board. EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence* (2013) (hereinafter "Connectivity Report"); Proposed Clean Water Rule, 79 Fed. Reg. at 22,222.

53.     The Connectivity Report came to a series of conclusions that served as the scientific underpinnings for the Clean Water Rule. First, streams and intermittent waters have a strong influence on the character and function on downstream waters. *Id.* at 22,222; Connectivity Report, at ES-2. In the proposed rule, the EPA found that "all tributary streams, including perennial, intermittent, and ephemeral streams, are *chemically, physically, and biologically connected* to downstream rivers via channels and associated alluvial deposits where water and other materials are concentrated, mixed, transformed, and transported." 79 Fed. Reg. at 22,222 (emphasis added). Second, EPA found that wetlands and open waters in riparian areas and floodplains "are chemically, physically, and biologically connected with rivers" and contribute to transport of organic matter, removal of excess nutrients, provide nursery habitat, and serve as sinks that retain floodwaters, sediment, nutrients, and contaminants that would otherwise harm downstream water quality. *Id.* at 22,223. Third, wetlands not in floodplains (vernal pools, prairie potholes, playa

18

lakes) benefit downstream water quality through floodwater storage, nutrient retention and transformation, and groundwater recharge. *Id.*

54.     Relying on the extensive scientific evidence developed during the rulemaking process, the Agencies finalized the Clean Water Rule on June 29, 2015. The Clean Water Rule established three categories of waters to determine coverage under the Clean Water Act: (1) waters that are jurisdictional in all instances, (2) waters that are never jurisdictional, and (3) other waters that are only jurisdictional if there is a significant nexus to a jurisdictional water. Clean Water Rule, 80 Fed. Reg. at 37,058–59.

55.     The Clean Water Rule defined jurisdictional waters, consistent with *Rapanos*, to include traditionally navigable waters, interstate waters, and territorial seas, along with impoundments of such waters. *Id.* at 37,057–58. Tributaries were also included as jurisdictional when they contribute to flow of a primary water with a bed, banks, and an ordinary high-water mark. *Id.* at 37,058. Tributaries were included because those waters "play an important role in the transport of water, sediments, organic matter, nutrients, and organisms to downstream waters." *Id.* The Clean Water Rule also included waters adjacent to jurisdictional waters, meaning wetlands, ponds, lakes, oxbows, and similar waters, as jurisdictional. *Id.* The Agencies established a geographic distance marker to establish the boundary of adjacent waters covered under the Clean Water Rule. *Id.*

56.     The Clean Water Rule defined a narrow category of other waters that would be subject to a case-specific analysis to determine jurisdiction. The Agencies identified "five types of waters in specific regions of the country that science demonstrates should be subject to a significant nexus analysis and are considered similarly situated by rule because they function alike and are sufficiently close to function together in affecting downstream waters." *Id.* at 37,059. These

waters—Prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands—are analyzed collectively in the watershed that drains to the nearest jurisdictional water. The Clean Water Rule recognized that these features constitute "similarly situated" waters and their impact on downstream waters must be determined collectively, not individually. *Id.* at 37,059. The "other waters" category also included waters that are not categorically protected but are located within the 100-year flood plain of a primary water or within 4,000 feet of the high tide line or ordinary high-water mark of a primary water, impoundment, or tributary. *Id.* These waters were also subject to a significant nexus analysis to determine jurisdiction under the Clean Water Act.

57.     The Agencies also clarified the waters that are expressly excluded from jurisdiction. *Id.* The Clean Water Rule expanded the waters not covered under the Clean Water Act, namely excluding ditches and artificial waters, as well as erosional features. *Id.* The Clean Water Rule maintained all prior exclusions from earlier regulations—converted cropland, waste treatment systems, stormwater control features—and codified exclusions that had been applied as a matter of agency practice. *Id.*

**Repeal and Replace the Clean Water Rule – the "Navigable Waters Protection Rule"**

58.     Efforts to repeal and replace the Clean Water Rule began on February 28, 2017, when President Trump issued an Executive Order titled "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule." Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Feb. 28, 2017). The Executive Order directed the EPA and Corps to review the Clean Water Rule for consistency with the Administration's policy—to promote economic growth, minimize regulatory uncertainty, and show due regard for the roles of Congress and the States. *Id.* at §§ 1, 2(a). Pursuant to that policy, the Agencies were ordered to "publish for

notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law." *Id*. at § 2(a). Further, the Executive Order instructed the Agencies to "consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos v. United States*, 547 U.S. 715 (2006)"—despite the fact that Justice Scalia's opinion was rejected by a majority of the Supreme Court and has not been followed by the Agencies when interpreting "waters of the United States. *Id*. at § 3. This executive fiat began the process to repeal the Clean Water Rule and replace it with the Navigable Waters Protection Rule, in violation of the Administrative Procedure Act.

59.     The Agencies initiated step one of what would become a two-step process to repeal and replace the Clean Water Rule by issuing a proposed rule to repeal the Clean Water Rule. Proposed Rule, Definition of "Waters of the United States"-Recodification of Pre-Existing Rules, 82 Fed. Reg. 34,899 (July 27, 2017). The Agencies indicated in the Proposed Rule that the Agencies would first commence efforts to repeal the Clean Water Rule, then issue a second regulation to replace the Clean Water Rule. *Id.*

60.     While in the process of repealing the Clean Water Rule, the Agencies issued a proposed rule to replace the Clean Water Rule with new regulations limiting the scope of the Clean Water Act's jurisdiction. On February 14, 2019, the Agencies issued the proposed rule titled "Revised Definition of 'Waters of the United States.'" 84 Fed. Reg. 4154 (Feb. 14, 2019). The proposed rule sought to limit the definition of "waters of the United States" to "traditional navigable water, including the territorial seas; tributaries that contribute perennial or intermittent flow to such waters; certain ditches; certain lakes and ponds; impoundments of otherwise jurisdictional waters; and wetlands adjacent to other jurisdictional waters." *Id.* at 4155. The proposed rule sought to exclude ephemeral streams—streams that only run in response to rainfall,

and non-adjacent wetlands—wetlands that did not have a hydrological surface connection to a jurisdictional water. *Id.* The Agencies provided no scientific evidence to support this change in the definition of "waters of the United States."

61.     The Agencies received over 620,000 comments on the proposed rule during the 60-day comment period. Final Rule, 85 Fed. Reg. at 22,261. Members from Chesapeake Bay Foundation submitted over 2,140 comments.

62.     On April 21, 2020, the Agencies published the Navigable Waters Protection Rule—the final rule revising the definition of "waters of the United States." *Id.* at 22,250. As explained above, the Final Rule strips protection for ephemeral streams and non-adjacent wetlands, as well as Delmarva bays and pocosins, by limiting jurisdiction to waters with surface water flow and connection.

## CAUSES OF ACTION

## COUNT 1

### The Agencies Violated the Administrative Procedure Act by Issuing a Final Rule Inconsistent with the Clean Water Act

63.     The allegations of the preceding paragraphs 1 through 62 are incorporated here by reference.

64.     The purpose of the Clean Water Act is clear—to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress created a comprehensive approach to restoring water quality, with a significant role for the federal government. The Final Rule skirts that role by significantly reducing the scope of federal protection for waters and wetlands, in direct contradiction with the purpose of the Act.

65.     It is arbitrary for the Agencies to adopt a regulation without establishing that the rule comports with the purpose of the statute. See *FCC* v. *Fox Television Stations, Inc.*, 556 U.S.

502, 515 (2009) (holding that an "agency must show that … [a] new policy is permissible under the statute" it is implementing); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious in the agency… entirely failed to consider an important aspect of the problem."). When adopting regulations that interpret statutory terms, the Agencies' interpretation must comply with the "purpose and intent of the statute… [and] no amount of deference can justify an interpretation of the statute that is contrary to law." *Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency,* 656 F.2d 768, 774 (D.C. Cir. 1981).

66. The Agencies' interpretation of "waters of the United States" adopted in the Final Rule is not consistent the with Clean Water Act and the objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress intended the Clean Water Act to broadly protect waters, "intend[ing] that the term 'navigable waters' be given the broadest possible constitutional interpretation." S. Rept. No. 92-1236, at 144 (1972) (Conf. Rep.). In fact, while debating the definition of "waters of the United States," Representative Dingell stated that the definition "clearly encompasses all water bodies, including main streams and their tributaries, for water quality purposes." 118 Cong. Rec. 33,757 (Oct. 4, 1972) (statement of Rep. Dingell). The broad reach of the jurisdiction of the Clean Water Act envisioned by Congress directly connects to the purpose of the statute. "Protection of aquatic ecosystems, Congress recognized, demanded broad federal authority to control pollution, for 'water moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'" *Riverside Bayview Homes*, 474 U.S. at 132–33 (citing S. Rep. No. 92-414, at 77 (1972)).

67. The Final Rule does not comport with the purpose of the statute. The Final Rule impermissibly focuses solely on the physical connectivity of the Nation's waters to evaluate "integrity" when defining "waters of the United States." 85 Fed. Reg. at 22,275–76, 22,279. This interpretation ignores the biological and chemical connections that create healthy waters, as expressly recognized in the purpose of the Act. This nearsighted approach to water protection removes significant numbers of waters from the Clean Water Act—including waters and wetlands that have a significant nexus to downstream navigable waters—which fundamentally hampers the objective to restore and maintain our Nation's waters.

68. The Agencies have not demonstrated how removing waters from Clean Water Act protections complies with the purpose of the Act. The Final Rule reduces the number of waters that would require a permit to discharge pollutants or fill wetlands, which inherently hinders the ability to restore and maintain national water quality. This is a vast departure from the purpose and intent of the Clean Water Act to restore and maintain water quality. The Final Rule that contradicts the purpose of the Clean Water Act, in violation of the Administrative Procedure Act.

## COUNT 2

### The Agencies Violated the Administrative Procedure Act by Adopting a Rejected Interpretation of the Clean Water Act

69. The allegations of the preceding paragraphs 1 through 68 are incorporated here by reference.

70. The Administrative Procedure Act provides that this court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). It is arbitrary and capricious for an agency to adopt an interpretation of a statutory term that is in direct conflict with controlling Supreme Court precedent interpreting the purpose of federal law. *See supra* ¶ 66.

71.     The Final Rule adopts an interpretation of "waters of the United States" that does not comply with the "significant nexus" standard as articulated in *Rapanos*. Every appellate court that has since considered the issue of "waters of the United States" has applied Justice Kennedy's interpretation and the resulting significant nexus test. *See, e.g., United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724–25 (7th Cir. 2006); *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007); *United States v. Moses*, 496 F.3d 984, 989–91 (9th Cir. 2007); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir. 2007); *United States v. Lucas*, 516 F.3d 316, 325–27 (5th Cir. 2008); *United States v. Bailey*, 571 F.3d 791, 798–800 (8th Cir. 2009); *United States v. Cundiff*, 555 F.3d 200, 210–13 (6th Cir. 2009); *United States v. Donovan*, 661 F.3d 174, 183–84 (3d Cir. 2011); *Precon Dev. Corp. v. U.S. Army Corps of Engineers*, 633 F.3d 278, 289 (4th Cir. 2011); and *Deerfield Plantation Phase II-B Prop. Owners Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 501 F. Appx. 268, 275 (4th Cir. 2012). The Final Rule rejects the well-settled precedent established by the federal courts applying the significant nexus test to determine Clean Water Act jurisdiction, without the proper legal justification for doing so.

72.     The Final Rule would predicate jurisdiction for wetlands on a direct surface connection to a traditionally navigable water. Final Rule, 85 Fed. Reg. at 22,251. The Agencies adoption of the Final Rule would unlawfully leave certain waters of the United States unprotected by rejecting the "significant nexus" test. The Agencies cannot adopt a regulation that rejects the Supreme Court's interpretation of the Clean Water Act. This is arbitrary, capricious, not in accordance with law, and in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C).

## COUNT 3

### The Agencies Violated the Administrative Procedure Act by
### Failing to Provide Adequate Notice and Comment

73.     The allegations of the previous paragraphs 1 through 72 are incorporated here by reference.

74.     The Agencies did not provide adequate notice and comment in the rulemaking process to repeal the Clean Water Rule.

75.     The Administrative Procedure Act requires the Agencies to provide notice of a proposed rulemaking that shares either the terms or the substance of a proposed rule. 5 U.S.C. § 553(b)(3). Then the agency's "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and the agency's must give "consideration of the relevant matter presented" and "shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* at §553(c).

76.     The notice and comment process in federal rulemaking serves a critical role in assuring federal regulations are well-developed and fair to those affected by the rulemaking. The public comment process "improves the quality of agency rulemaking by ensuring that agency regulations will be tested by exposure to diverse public comment." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). In addition, the ability to submit information to the agencies during the rulemaking process enhances juridical review. *Id.*

77.     An agency is required to "make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." *Home Box Office, Inc. v. Federal Communications Commission*, 567 F.2d 9, 36 (D.C. Cir. 1977); *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 885 (4th Cir. 1983).  If the Agencies do not provide adequate evidence of the agencies' reasoning behind the proposed rule, the public's ability to comment on

the proposal is significantly hampered. See *Ohio Valley Envtl. Coal. v. Army Corps of Eng'rs*, 674 F.Supp. 2d 783, 802–03 (S.D. WV 2009). Such is the case here with the Final Rule.

78.     The Agencies failed to provide adequate justification for their actions in the Proposed Rule, which severely limited the ability of the public to comment on the proposal. The Agencies issued a Proposed Rule requesting comments on multiple issues, with no legal or scientific rationale indicating how the Agencies would implement the proposed rule. *See supra* Counts 4 through 6. The overly broad proposal does not provide the public with the opportunity to meaningfully comment, which Courts have disavowed. *See CSX Transp., Inc. v. Surface Transp. Bd.,* 584 F.3d 1076, 1083 (D.C. Cir. 2009). This prevented the public from meaningfully commenting on the reasoning of the Agencies' decision-making, in violation of the Administrative Procedure Act and the strong body of case law defining "meaningful public comment."

79.     Therefore, this Court should vacate the repeal of the Clean Water Rule as it violated the notice-and-comment requirements of the Administrative Procedure Act. 5 U.S.C. § 553(b).

## COUNT 4

### The Agencies Violated the Administrative Procedure Act by
### Failing to Provide a Reasoned Explanation for Rejecting its Prior Regulation

80.     The allegations of the preceding paragraphs 1 through 79 are incorporated here by reference.

81.     The Agencies have failed to provide a reasoned explanation for their about-face change in position over the definition of "waters of the United States."

82.     The Administrative Procedure Act requires agencies to articulate a reasonable explanation for their decisions. In deregulatory actions, an agency must provide a reasoned explanation for its action, and not "simply disregard rules that are still on the books.*" Fox*, 556 U.S. at 515; *see also Physicians for Soc. Responsibility v. Wheeler,* No. 19-5104, 2020 U.S. App.

LEXIS 12727 at *19–20 (D.C. Cir. Apr. 21, 2020).  As such, an agency cannot reverse course on a regulation without articulating a reasonable explanation for such a change, as "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox,* 556 U.S. at 515–16. This requirement is especially important when the new policy "rests upon factual findings that contradict those which underlay its prior policy[.]" *Id.* at 515.

83.     Here, the Agencies have not articulated reasoned explanation for rejecting the Clean Water Rule in order to support the issuance of the Final Rule. The Clean Water Rule was supported by a well-developed scientific record and a robust public comment period. Clean Water Rule, 80 Fed. Reg, at 37,057. The Final Rule has no such support and does not provide a reasoned explanation for rejecting the foundational science supporting the Clean Water Rule and its application to jurisdiction. *See* Counts 5 and 6.

84.     Instead the Agencies reached a series of conclusions about the jurisdictional scope of the Clean Water Act devoid of the scientific realities of hydrological science and the comments of the public. The Agencies "explanation" for changing their position on the definition of "waters of the United States" was based on an illegal interpretation of the Clean Water Act, with no scientific support. The Agencies have hardly met their burden to change course on a regulatory definition.

85.     The Agencies have failed to provide a reasoned explanation for their about-face change in position over the definition of "waters of the United States." This violates the Administrative Procedure Act.

## COUNT 5

**The Agencies Violated the Administrative Procedure Act by Failing to Evaluate the Environmental Impacts of the Final Rule**

86.     The allegations of the preceding paragraphs 1 through 85 are incorporated here by reference.

87.     The Agencies failed to evaluate the environmental impacts of the Final Rule on water quality, which violates the Administrative Procedure Act.

88.     During the rulemaking process, federal agencies are required to "examine the relevant data and articulate … satisfactory explanation[s] for … [their] action[s]", which must address every "important aspect" of the issue. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. The Agencies have not done so here.

89.     By their own admission, the Agencies concede that they did not evaluate the impacts of the jurisdictional changes from the rule by claiming that it would be impossible to fully map and evaluate all rivers, streams, wetlands, and other water features to determine how the changes in jurisdictional waters would impact water quality. Final Rule, 85 Fed. Reg. at 22,332. But this claim does not pass muster, as numerous environmental groups provided public comments to the agency offering resources and opportunities for the agency to evaluate as a baseline level the impacts the rule would have on water quality. See Chesapeake Bay Foundation Comments, Docket ID No. EPA-HQ-OW-2018-0149-4878; ShoreRivers Comments, Docket ID No. EPA-HQ-OW-2018-0149-5331; Natural Resources Defense Council Comments, Docket ID No. EPA-HQ-OW-2018-0149-11460; Southern Environmental Law Center Comments, Docket ID No. EPA-HQ-OW-2018-0149-9717.

90.     Further, the agency provided rough estimates of the numbers of streams and wetlands that would lose protection under the proposed rule but then failed to evaluate the impacts

of removing streams and wetlands by claiming the data to produce the estimates was not sufficiently accurate to analyze. However, even with a rough estimate, the Agencies would have seen how the removal of these streams and wetlands would impact water quality.

91.     The blatant lack of effort or refusal to acknowledge information to analyze the impacts of the Final Rule on water quality and wetland functions and services violates the Administrative Procedure Act. 5 U.S.C. § 706(2).

## COUNT 6

### The Agencies Violated the Administrative Procedure Act by Issuing a Final Rule Not Supported by Scientific Evidence

92.     The allegations of preceding paragraphs 1 through 91 are incorporated here by reference.

93.     The Agencies adopted a Final Rule that is not supported by scientific evidence, in violation of the Administrative Procedure Act.

94.     The Final Rule squarely rejected the ample science developed to support the 2015 Clean Water Rule that illustrated the direct impact streams and wetlands have on downstream water quality, i.e. that there is often a significant nexus between streams and wetlands and traditionally navigable waters.

95.     The 2015 Connectivity Report establishes that connectivity of waters is based on more than surface geography, and that functional relationships determine adjacency not just surface water connection. During the development of the Final Rule, the Agencies offered no comparable body of evidence or scientific justification for rejecting well-founded principles of hydrology demonstrated in the Connectivity Report.

96.     Further, the Agencies rejected the expertise of their own Scientific Advisory Board during the development of the Final Rule. In June of 2019, the Scientific Advisory Board convened

and discussed the scientific and technical basis for the proposed rule. The Board subsequently concluded that the proposed rule "does not incorporate the best available science and as such we find that a scientific basis for the proposed rule, and its consistency with the objectives of the Clean Water Act, is lacking." EPA Scientific Advisory Board, Commentary on the Proposed Rule Defining the Scope of Waters Regulated Under the Clean Water Act 1 (Feb. 27, 2020), https://yosemite.epa.gov/sab/sabproduct.nsf/WebBOARD/729C61F75763B8878525851F00632 D1C/$File/EPA-SAB-20-002+.pdf ("SAB Commentary"). The Board expressly faulted the proposed rule for rejecting the Connectivity Report, which "emphasizes that functional connectivity is more than a matter of surface geography." *Id*. at 2. The Board criticized the Agencies for not offering a "comparable body of peer reviewed evidence, and no scientific justification for disregarding the connectivity of waters accepted by current hydrological science." *Id*.

97.     Therefore, the issuance of the Final Rule is arbitrary and capricious as it is not supported by scientific evidence.

## COUNT 7

### The Agencies Violated the Administrative Procedure Act by Relying on a Fundamentally Flawed Economic Analysis

98.     The allegations of the preceding paragraphs 1 through 97 are incorporated here by reference.

99.     The Agencies support the Final Rule with a deeply flawed economic analysis that undercuts the true costs of the rule. This is arbitrary and capricious.

100.     The Clean Water Act does not require a cost-benefit analysis when promulgating definitional regulations, but various executive orders require federal agencies to assess both the costs and benefits of significant regulatory actions. Exec. Order No. 12,866, Regulatory Planning

and Review, 58 Fed. Reg. 190 (Oct. 4, 1993). If federal agencies rely on an economic analysis to justify their decision, that analysis is subject to scrutiny under the Administrative Procedure Act. See, e.g., *Nat'l Assn'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-50 (noting that the quality of an agency's economic analysis can be tested under the Administrative Procedure Act if the "agency decides to rely on a cost-benefit analysis as part of its rulemaking.") If an agency does undergo an economic analysis, "a serious flaw undermining that analysis can render the rule unreasonable." *Id.*

101.    The Agencies developed an economic analysis during the rulemaking process. EPA and Dep't of the Army, *Economic Analysis for the Navigable Waters Protection Rule: Definition of 'Waters of the United States'* (Jan. 22, 2020) [hereinafter Economic Analysis]. The Agencies purport to not rely on the Economic Analysis in developing the Final Rule. Final Rule, 85 Fed. Reg. at 22,332. But this cannot be true, as the Economic Analysis expounds on a key conclusion that the Agencies erroneously rely on to issue the Final Rule—states will fill the gap in water quality protection. *See* Count 8. The Economic Analysis evaluated states responses to a federal retreat of Clean Water Act jurisdiction to determine the avoided costs and forgone water quality and wetland benefits of the Final Rule. Economic Analysis, at 44. The Final Rule relies heavily on the assumption that states will assume jurisdiction of waters no longer covered by the Clean Water Act. Final Rule, 85 Fed. Reg. at 22,333–34. This analysis was developed in the Economic Analysis, meaning that the Economic Analysis provides justification for the Final Rule, subjecting it to scrutiny under the Administrative Procedure Act.

102.    The Agencies committed significant flaws in the economic analysis underlying the Final Rule. First, the Agencies compared the Final Rule with the 2019 Rule to repeal the Clean Water Rule and reinstate the 1986 regulations, instead of comparing the Final Rule to the 2015

Clean Water Rule. Economic Analysis, at 53; *see also* Final Rule, 85 Fed. Reg. at 22,332. This represents a significant flaw in the analysis, as the Agencies are not truly comparing the deregulatory action, the Final Rule, with the regulation it replaces, the Clean Water Rule. Instead the Agencies set the baseline for determine economic costs as the murky regulatory field that existed prior to the 2015 Clean Water Rule.

103.    In developing the 2015 Clean Water Rule, the Agencies determine that the regulatory clarity offered by the Clean Water Rule would actually reduce permitting costs as fewer jurisdictional determinations would be necessary. EPA and Department of the Army, Economic Analysis of EPA-Army Clean Water Rule ix (May 20, 2015), https://www.epa.gov/sites/production/files/2015-06/documents/508-final_clean_water_rule_economic_analysis_5-20-15.pdf. When analyzing the costs and benefits of the 2015 Clean Water Rule, the Agencies estimated both a low and high costs, ranging from $158.4 million to $306.6 million. *Id.* at x. The Agencies estimated the benefits of the rule to range from $338.9 million to $349.5 million. *Id.* But in the Economic Analysis for the Final Rule, the Agencies frame the cost-benefit analysis as the avoided costs of permitting, i.e. money saved from no longer needing permits, and loss of foregone benefits, i.e. the cost to society from losing protection for waters and wetlands. Economic Analysis at xii. This shift makes it extremely difficult for the public to compare the actual costs and benefits of the Final Rule with the Clean Water Rule, again because the Agencies have not done so in their own analysis. This is fundamentally arbitrary.

104.    The Economic Analysis acknowledges the significant costs associated with the loss of streams and wetlands and their associated ecosystem services, in addition to increased downstream flooding, increased restoration costs, increased costs for drinking water providers, and

increased oil spill response costs. Economic Analysis, at 105–08. But the agencies discredit all of these costs of removing waters from Clean Water Act jurisdiction by classifying these expenses as forgone benefits instead of added costs. The Agencies then concluded that the avoided expense of permitting outweigh the benefits lost from protecting wetlands and streams. Final Rule, 85 Fed. Reg. at 22,333–34. By classifying the services provided by wetlands and streams as simply forgone benefits, the Agencies fundamentally upend the economic impact of the Final Rule by failing to evaluate the costs incurred by the loss of ecosystem services and the increased cost for restoration, drinking water providers, and oil spill response costs that will result from removing these waters from protection under the Clean Water Act. This constitutes a serious flaw in the analysis, rendering the rule unreasonable.

## COUNT 8

### The Agencies Violated the Administrative Procedure Act by Relying on Factors Congress did not Intend for the Agencies to Consider

105. The allegations of the proceeding paragraphs 1 through 104 are incorporated here by reference.

106. The Final Rule violates the Administrative Procedure Act by relying on factors that Congress did not intend the Agencies to consider—states filling in the gaps in clean water protection.

107. In developing the Final Rule, the Agencies evaluated state Clean Water Act programs, including state policies defining and regulating state waters in order to "describe the breadth of state authorities." EPA and Dep't of the Army, Appendices to the Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States" 1 (Jan. 23, 2020), https://www.epa.gov/sites/production/files/2020-01/documents/rpa_finalappendices.pdf. The Final Rule expressly relies on states to protect waters

removed from the "waters of the United States" definition. The Agencies determined that interstate waters without surface water connection to traditionally navigable waters, ephemeral streams, and non-adjacent wetlands "are more appropriately regulated by States and Tribes pursuant to their own authorities." Final Rule, 85 Fed. Reg. at 22,284, 22,287, 22,308. The Agencies assume that states will implement programs to protect waters in the wake of a federal retreat from Clean Water Act protections. Proposed Rule, 84 Fed. Reg. at 4,201.

108.    Even though the Agencies conclude that it is more appropriate for states to regulate these waters, the Agencies were unable to "predict what changes [in state regulations] might result from the final rule." Economic Analysis, at 34. The Agencies therefore relied on a factor Congress did not intend for them to consider and did not meaningfully evaluate whether that reliance was misplaced. This is fundamentally arbitrary.

109.    By relying on states to be solely responsible for stream and wetland protections, the Agencies have relied on factors Congress did not intend the Agencies consider. When passing the Clean Water Act, Congress created a comprehensive approach to water quality protection that directly rejected the prior tactic of relying on state actions without strong federal support. *Riverside Bayview Homes*, 474 U.S. at 133 (Congress granted "broad federal authority to control pollution"); see S. Rept. 92-414 at 1, 7 (highlighting that the prior regime of states leading the national effort to fight pollution with the Federal government limited to assisting the states had been "inadequate in every vital aspect.").

110.    The Clean Water Act established strong federal baseline requirements for states to follow, and if states do not follow these requirements the federal government must act. *See* 33 U.S.C. § 1313 (requiring the Administrator to set water quality standards if States do not, to list impaired waters if the Administrator disapproves of the state list, to develop Total Maximum Daily

Loads to improve impaired waters if states fail to do so sufficiently). The Clean Water Act directs the Agencies to set the agenda for water protection and delegates states with the authority to implement day-to-day programs including the various permitting programs. Congress did not intend for vast numbers of waters to be left solely to the states to protect under varying state laws, as the Act granted broad federal authority to define "waters of the United States" and the scope of jurisdiction under the Clean Water Act.

111.    By relying on states to act in lieu of a comprehensive federal definition of "waters of the United States," the Agencies are relying on a factor that Congress did not intend the Agencies to consider. This is arbitrary and capricious.

## COUNT 9

### The Agencies Violated the Administrative Procedure Act by Adopting a Rule that Prevents the Agencies from Complying with Statutory Duties under the Clean Water Act

112.    The allegations of the proceeding paragraphs 1 through 111 are incorporated here by reference.

113.    The Final Rule prevents the Agencies from complying with their statutory duty under Section 117(g) of the Clean Water Act to restore the Chesapeake Bay; to meet their obligations under the Chesapeake Bay TMDL; and to achieve the goals of the 2014 Chesapeake Bay Watershed Agreement. *See* 33 U.S.C. § 1267(g); Bay TMDL, at ES-1; Chesapeake Bay Watershed Agreement, at 5, 9. Removing waters and wetlands from Clean Water Act jurisdiction interferes with the Agencies responsibility to restore water quality in the Chesapeake Bay. See *supra* ¶¶ 6–11.

114.    It is arbitrary and capricious for the Agencies to adopt the Final Rule, which prevents the Agencies from complying with their duties under the Clean Water Act and the

Chesapeake Bay Watershed Agreement. As such, the Final Rule violates the Administrative Procedure Act.

<div align="center">**REQUEST FOR RELIEF**</div>

Plaintiffs respectfully request that this Court:

1.　　Declare that defendant Agencies acted arbitrarily and unlawfully in promulgating the challenged rule: The Navigable Waters Protection Rule: Definition of "Waters of the United States", 85 Fed. Reg. 22,250 (Apr. 21, 2020);

2.　　Vacate and set aside the challenged rule;

3.　　Issue injunctive relief to prevent the Agencies from using, applying, enforcing, or otherwise proceeding on the basis of the Rule;

4.　　An order awarding Plaintiffs their costs of litigation, including reasonable attorney's fees; and

5.　　Grant plaintiffs such further relief as the Court deems necessary.

Dated April 24, 2020.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Brittany E. Wright
Brittany E. Wright (Bar No. 21029)
Jon A. Mueller (Bar No. 17142)
Chesapeake Bay Foundation, Inc.
6 Herndon Avenue
Annapolis, MD 21403
(443) 482-2077
Fax: (410) 268-6687
bwright@cbf.org
jmueller@cbf.org

*Counsel for Chesapeake Bay Foundation, Inc. and ShoreRivers*

</div>